UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DOUGLAS A. GROSS,                           :
                                            :CIVIL ACTION NO. 3:14-CV-1946
          Plaintiff,                        :
                                            :(JUDGE CONABOY)
          v.                                :
                                            :
CAROLYN W. COLVIN,                          :
Acting Commissioner of                      :
Social Security,                            :
                                            :
          Defendant.                        :
                                            :

## MEMORANDUM

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). (Doc. 1.) The Administrative Law Judge ("ALJ") who evaluated the claim concluded that Plaintiff's severe impairments of varicose veins, obesity, hypertension, pancreatitis, obstructive sleep apnea, depressive disorder and anxiety disorder did not meet or equal the listings. (R. 82-83.) The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform sedentary work with certain limitations and that such work was available. (R. 85-89.) The ALJ therefore denied Plaintiff's claim for benefits. (R. 90.) With this action, Plaintiff argues that the decision of the Social Security Administration is error because the ALJ did not give appropriate weight to Plaintiff's subjective complaints of testicular pain related to varicoceles and the ALJ's RFC and step five determination were flawed in that they

did not take the testicular pain into account.  (Doc. 18 at 2-15.)
For the reasons discussed below, we conclude Plaintiff's appeal of
the Acting Commissioner's decision is properly denied.

## I.Background

### A.   *Procedural Background*

On December 16, 2011, Plaintiff protectively filed
applications for DIB and SSI.  (R. 80.)  On both applications, the
claimant alleged disability beginning on November 26, 2011.  (*Id.*)
Plaintiff stated that he applied for benefits because his ability
to work was limited by depression, pancreatitis, varicose veins and
trouble sleeping.  (R. 238.)  The claims were initially denied on
March 30, 2012.  (R. 181-88.)  Plaintiff filed a request for a
review before an ALJ on April 20, 2012.  (R. 189.)  On March 20,
2013, Plaintiff, with his attorney, appeared at a hearing before
ALJ Susan Torres.  (R. 97.)  Vocational Expert Josephine Doherty
also testified at the hearing.  (*Id.*)  The ALJ issued her
unfavorable decision on May 29, 2013, finding that Plaintiff was
not disabled under the Social Security Act during the relevant time
period.  (R. 90.)

On June 7, 2013, Plaintiff filed a Request for Review with the
Appeal's Council.  (R. 75-76.)  The Appeals Council denied
Plaintiff's request for review of the ALJ's decision on August 4,
2014.  (R. 1-6.)  In doing so, the ALJ's decision became the
decision of the Acting Commissioner.  (R. 1.)

On October 7, 2014, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision. (Doc. 1.) Defendant filed her answer and the Social Security Administration transcript on December 23, 2014. (Docs. 9, 10.) Plaintiff filed his supporting brief (Doc. 18) on April 8, 2015, after having requested and been granted two extensions of time within which to do so (Docs. 11, 12, 16, 17). Defendant filed her opposition brief on May 7, 2015. (Doc. 19.) Plaintiff filed his reply brief on May 28, 2015. (Doc. 22.) Therefore, this matter is ripe for disposition.

**B.    *Factual Background***

Plaintiff was born on July 18, 1972, and was thirty-nine years old on the alleged disability onset date. (R. 89.) Plaintiff has a high school education. (*Id.*) Plaintiff last worked as a driver for K-Cab. (R. 103.) Plaintiff testified that he stopped working because

> I was worried that my concentration was bad, my focus was bad and I just got to the point with like sitting all the time . . . in the cab it was bothering me with my groin area, stuff like that and I couldn't deal with it and I was afraid that I was going to end up doing something wrong while I was driving.

(R. 103.)

**1.    Impairment Evidence**

**a.    *Physical Impairment Treatment Records and Notes***

Because Plaintiff's objections to the ALJ's decision related

3

to the improper consideration of his testicular pain, we will focus
primarily on the records related to that condition.

On April 1, 2008, Plaintiff was seen at Alley Medical Center
with complaints of headache and testicular pain.  (R. 522.)  He
reported that the onset of the pain was acute and had been
occurring for one week in an intermittent pattern.  (*Id.*)  An April
7, 2008, radiology report indicated large varicocele bilaterraly
and mild hydrocele bilaterally.  (R. 343.)

On April 14, 2008, Plaintiff was seen at Berwick Hospital for
scrotal or groin pain which he reported he had been having for
about two weeks.  (R. 327.)  Plaintiff had bilateral pain and rated
the pain in his right testicle at nine on a scale of one to ten.
(R. 331-32.)  The recorded impression was acute epididymitis and
acute orchiditis.  (R. 333.)  Plaintiff was discharged the same day
with prescriptions for cipro and percocet and directions to follow
up with Dr. Aldo Suraci.  (*Id.*)

Plaintiff underwent surgery for bilateral varicocele on August
8, 2008.  (R. 298.)  Plaintiff reportedly tolerated the procedure
well and was discharged the same day with oral pain medication.
(R. 299.)

When Plaintiff was seen with complaints of a cough on October
21, 2008, his "Problem List/Past Medical" information did not
include groin or testicular pain; "no known medications" was
recorded under "Medication History."  (R. 520.)

4

On January 13, 2009, Plaintiff had a scrotal ultrasound which showed bilateral varicoceles, unremarkable testicles, and a tiny right epididymal cyst.  (R. 652.)  The "Hhistory" portion of the report indicated "[s]crotal varices, status post bilateral varicocele repair with persistent pain."  (*Id.*)

On January 15, 2009, Plaintiff was seen with complaints of chest pain.  (R. 511.)  No scrotal or testicular pain was noted in the recorded review of systems.  (*Id.*)

On February 24, 2009, Plaintiff was seen for a preoperative history and physical.  (R. 309, 656.)  He was scheduled for surgery on March 11, 2009, for scrotal exploration and epididymal cyst excision.  (R. 309, 656.)

On August 19, 2009, Plaintiff was seen for what he described as sinusitis.  (R. 509.)  He was treated for that problem, and the assessment also noted lower extremity varicose vein.  (R. 510.) After having tried conservative treatment, Plaintiff had surgery on his left leg on March 26, 2010.  (R. 314-15.)  The following findings were recorded: "Positive greater saphenous vein reflux. Positive varicose veins.  Status post procedure . . . greater saphenous vein was ablated and varicose veins removed."  (*Id.*)  He had similar surgery on the right side on April 2, 2010.  (R. 321.)

The review of systems conducted at a May 14, 2010, office visit where Plaintiff complained of malaise and abdominal pain indicates that Plaintiff did not have any male genitourinary

symptoms.  (R. 498.)

On May 16, 2010, Plaintiff was admitted to CMC-Geisinger Medical Center.  (R. 352.)  Plaintiff was discharged on May 20, 2010 with a diagnosis of acute pancreatitis most likely gallstone/sludge related.  (*Id.*)  Plaintiff underwent laparascopic cholecystectomy by general surgery.  (*Id.*)  He tolerated the procedure well, and his pain improved.  (*Id.*)  The review of systems at the time indicates Plaintiff denied any genitourinary symptoms.  (R. 376.)

Plaintiff was again admitted on May 26, 2010, and discharged on May 29, 2010, with a diagnosis of acute pancreatitis.  (R. 423.) He was started on conservative treatment with pain medication and his pain improved.  (*Id.*)

On May 10, 2011, Plaintiff was seen in Geisinger's emergency medicine department with complaints of right testicular pain with radiation into the abdomen.  (R. 541.)  Plaintiff stated that the pain had been gradually worsening over the preceding week.  (*Id.*) Ultrasound revealed bilateral varicoceles, left hydrocele, right scrotal wall thickening but unremarkable and symmetric testicles. (R. 543.)  Plaintiff was diagnosed with  abdominal pain of uncertain etiology and bilateral varicoceles.  (*Id.*)  The plan was to treat the abdominal pain and it was suggested he follow up with his urologist.  (*Id.*)

Two days later Plaintiff again presented to the emergency

6

medicine department with abdominal pain, headache, and groin pain. (R. 526.)  At the time, he had no primary care physician and no insurance.  (R. 528.)  The May 12, 2011, visit notes indicate that the abdominal pain no longer radiated to the testicles but radiated to his mid back.  (R. 526.)

On August 11, 2011, Plaintiff visited Columbia County Volunteers in Medicine for the first time.  (R. 723.)  He complained of abdominal pain over the preceding week.  (*Id.*)  The assessment was possible mild pancreatitis.  (*Id.*)  Plaintiff was directed to restrict his diet to clear liquids for twenty-four hours and go to the ER for any severe pain.  (*Id.*)  He was also provided a note to excuse him from work duties for the week.  (*Id.*)  Plaintiff reported he was feeling much better at his September 16, 2011, visit.  (R. 720.)  He was still having abdominal discomfort at his November 29, 2011, visit.  (R. 719.)

On February 24, 2012, Plaintiff was seen by Maliyakkal John, M.D., a consultative examiner.  (R. 732-38.)  Plaintiff's personal history includes the following: "He says that he gets headaches off and on for a couple of days [] a week lasting for about an hour or two, mostly the frontal headache.  He also states that he cannot concentrate enough on any given assignment.  So, he told his boss that he cannot work anymore."  (R. 737.)  In the Review of Systems, Dr. John noted that Plaintiff has a "[history of headache for the past three months.  He has not seen any physician or sought any

7

medical advice for that. No history of head trauma. No history of migraine in the past." (*Id.*) The Review of Systems was otherwise unremarkable as was the physical examination except under "Genitilia" Dr. John noted that Plaintiff had "swelling of both testicles more on the right side and diffuse tenderness." (R. 738.) Dr. John recorded the following assessment: "Recent onset of headache, etiology unclear; varicose veins of testicles with three surgeries so far. Varicose veins of both legs, which is almost corrected with surgical intervention. Chronic headache, varicocele of the testicle, and varicose veins of both legs. Chronic pancreatitis." (R. 738.)

On June 21, 2012, Plaintiff was seen at Geisinger by Joshua D. Hottenstein, M.D., as a new patient. (R. 810.) Dr. Hottenstein notes Plaintiff had been going to the free clinic and was now on Access and seeking permanent disability due to anxiety/depression. (*Id.*) The notes also indicate Plaintiff reported he had "recurrent scrotal varices, painful after standing," diabetes, depression/anxiety, and occasional heartburn. (*Id.*) His diagnosis included scrotal varices. (R. 811.) Plaintiff's genitourinary exam showed "testicles normal, tender varicocele bilaterally." (R. 812.) The plan included to refer him to urology for this condition. (R. 813.)

On July 9, 2012, Plaintiff had an ultrasound of the scrotum because of painful varicoceles. (R. 823.) The impression was

bilateral varicoceles and small left hydrocele.  (*Id.*)  Follow up with urology for further treatment was recommended.  (R. 825.)

At Plaintiff's August 2, 2012, office visit for follow up with Dr. Hottenstein, Plaintiff reported that he was doing ok but sleeping poorly.  (R. 827.)  He was going to discuss this with a psychiatrist "soon" (Plaintiff was already taking Remeron but reported waking up two hours after going to sleep).  (*Id.*)  The recorded diagnoses include bilateral varicoceles.  (R. 827.)  This condition and/or related symptoms were not otherwise discussed in the treatment notes.  (*See* R. 427-29.)  Plaintiff was instructed to return in two months.  (R. 829.)

On August 6, 2012, Plaintiff saw Jennifer Simmons, M.D., at Geisinger's urology department, Plaintiff reported return of pain and swelling related to his scrotal problem one year after being treated surgically in 2009.  (R. 840.)  The following was also recorded:

> He has pain almost all the time.  Sometimes it is on the right and sometimes on the left.  The pain is moderate to severe 6-10 depending on what he is doing.  Activity seems to make it worse.  Lifting seems to make it worse.  Laying down does not reliable relieve the pain.  He notes the left side is larger than the right.  He tries to sit down and relax to make the pain lighten up.  The right sided pain is often worse than the left.  He tries ibuprofen and tylenol with little relief.  He wears boxer briefs for support.

(R. 840.)  Plaintiff reported the pain to be five on a scale of one to ten at the time of the visit, and he reported the pain to be

9

continuous. (R. 841.) Dr. Simmons prescribed Gabapentin. (R. 842.)

At the October 4, 2012, follow-up visit, Dr. Hottenstein reviewed Plaintiff's diabetes, obesity and varicoceles. (R. 888.) He noted that Plaintiff was on Gabamentin and urology declined to operate. (*Id.*) His plan was for Plaintiff to continue on the Gabapentin. (R. 890.) He was to return in three months. (*Id.*)

On November 26, 2012, Plaintiff again saw Dr. Simmons. (R. 905.) She recorded the same history as that of August 6, 2012, adding that the Gabapentin had "helped about 70%." (*Id.; see* R. 840.) In her assessmesnt/plan, Dr. Simmons noted that Gabapentin was working for the scrotal pain and she would continue it at 800 mg. twice a day for three more months and then slowly wean over the fourth month. (R. 905.) Plaintiff was not having pain at the time of the visit. (R. 906.) Plaintiff was to return in three months. (R. 910.)

On January 10, 2013, Plaintiff was seen at Dr. Hottenstein's office for follow up. (R. 912-13.) Plaintiff reported that he was "feeling ok overall." (R. 913.) He was taking Gabapentin at the time, the office visit notes indicating he would start to wean off it in ninety days. (R. 914.) Physical examination showed that generally Plaintiff was alert and in no distress. (R. 915.) Other than being listed in the Active Problem List, no other reference is made to Plaintiff's bilateral varicoceles at this visit--the

10

Assessment/Plan addressed Plaintiff's diabetes, eczema, dyslipidemia, and the need for pneumonia and flu vaccines. (R. 915.) Plaintiff was directed to return in three months. (*Id.*)

### b. *Mental Impairment Treatment Evidence and Notes*

There is very little reference to Plaintiff's mental health in his visits to his treating physicians. For example, in January 2009, no mental health issues were identified in Plaintiff's "Problem List/Past Medical." (R. 511.) The same is true of his January and May 2010 visits. (R. 498, 602.) Plaintiff's 2011 records do not indicate mental health issues until November. (See R. 530-33, 719, 720, 723.) Because of the limited scope of the claimed errors, we will briefly review mental health evidence.

At Plaintiff's November 29, 2011, visit to Columbia County Volunteers in Medicine, anxiety is noted. (R. 719.) It does not appear that he was prescribed medication for the condition. (*Id.*)

Plaintiff was referred for psychological evaluation to Sue Labar Yohey, M.Ed., who completed a consultative examination report dated March 9, 2012. (R. 742-51.) Plaintiff indicated to Dr. Yohey that "he leaves jobs because he feels he becomes 'a burden to the job,' and 'bothersome.' He reports that he was frequently ill with headaches. He thought of disability himself." (R. 743.) Plaintiff told Dr. Yohey that he did not think he would be able "to maintain regular attendance at a daily job or appointment. He indicates this is because of the lack of sleep, headaches and his

11

lack of concentration." (R. 747.) Dr. Yohey noted that Plaintiff had two sessions of counseling at the Mifflinville Clinic and she called CMSU while he was in the office, hoping he would get services there. (R. 744.) She observed that Plaintiff's motor behavior, affect and cultural development were appropriate. (*Id.*) In her summary, Dr. Yohey concluded that Plaintiff was showing signs and symptoms consistent with a Depressive Disorder and she had discovered that he had a history of panic attacks. (*Id.*) Dr. Yohey completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) which will be reviewed in the Opinion Evidence section which follows.

As noted above, Plaintiff reported to Dr. Hottenstein at Geisinger on June 21, 2012, that he was seeking permanent disability due to anxiety and depression. (R. 810.) Office visit notes indicate Plaintiff reported that his depression/anxiety was not controlled by Remeron and he had some fear of public places because "anxiety kicks up sometimes in public places." (*Id.*) He had begun treatment at CMSU the previous month and had a follow up there in two months. (*Id.*) Dr. Hottenstein added: "He says most days he wants to die, won't tell me what his plan would be, but never sets a date or has an intention because doesn't want to do that to his mom." (*Id.*) At the time, Plaintiff was taking one-half tablet of Remeron at bedtime. (R. 811.) Dr. Hottenstein planned to try to expedite Plaintiff's psychiatric appointment

follow up.  (R. 812.)

At Plaintiff's August 2, 2012, office visit, Dr. Hottenstein included anxiety and depression in Plaintiff's Active Problem/Diagnoses list.  (R. 827.)  He noted regarding Plaintiff's "anxiety state" that Plaintiff was doing well but sleeping poorly. (R. 829.)

In a Psychiatric Evaluation dated May 1, 2012, Robert Gerstman, D.O., found Plaintiff to be cooperative with fair eye contact, "sad" mood, restricted affect, goal directed thought processes, intact cognition, and appropriate insight and judgment. (R. 778.)  Dr. Gerstman found Plaintiff's "[t]hought content was absent for thought of self-harm or harm to others; absent for auditory hallucinations or delusions."  (*Id.*)  He recorded the following Diagnostic Impression: Axis I - Social Anxiety Disorder and Poly-Substance Dependence with long-term remission; Axis II - Deferred; Axis III - History of pancreatitis; Axis IV - multiple stressors; and Axis V - GAF 50.  (R. 779.)  Dr. Gerstman recommended a trial of Remeron 15 mg. to 30 mg. at night and follow-up in two months.  (*Id.*)

Plaintiff was seen by Dr. Gerstman at CMSU on August 14, 2012. (R. 777.)  He reported that the Remeron 15 mg. helped "take the edge off" but sleep remained an issue.  (*Id.*)  Plaintiff's mood was recorded as "slightly anxious," he was alert, and had good judgment and insight.  (*Id.*)  Social anxiety disorder is recorded as

13

Plaintiff's Axis I diagnosis; no notations are made for Axis II through Axis V). (*Id.*) The plan was to increase the Remeron to 30 mg. and take Ambien 10 mg. at night if needed to sleep. (*Id.*)

At Plaintiff's October 16, 2012, visit to CMSU, Dr. Gerstman recorded that subjectively Plaintiff felt better taking Remeron 15 mg. so returned to that dosage, Ambien was helping with sleep, and he was getting out more "however social anxiety gets the best to [sic] you." (R. 776.) Dr. Gerstman's findings were similar to those of Plaintiff's August visit except that Plaintiff's mood was reported to be euthymic rather than slightly anxious. (*Id.*) Plaintiff's Axis I assessment was bipolar disorder. (*Id.*)

On February 19, 2013, Plaintiff reported that he could not tolerate the 30 mg. Remeron but the 15 mg "takes the edge off," adding "it's still there; still having mood swings." (R. 775.) Plaintiff's mood was anxious and irritable, and his insight and judgment fair. (*Id.*) Dr. Gerstman's assessment was Axis I social anxiety disorder and Axis III chronic pain issues. (*Id.*) His plan was to discontinue the Remeron and Ambien, increase the Gabapentin to 800 mg., and add Doxepin, 75 mg. at night. (*Id.*)

### c. Opinion Evidence

A February 24, 2012, report from consultative examiner Maliyakkal John, M.D., indicates that Plaintiff had the capacity to lift and carry twenty-five pounds frequently and fifty pounds occasionally, he could stand and walk for one to two hours in an

14

eight hour day and sit for less than six hours. (R. 732.)  He could frequently perform all postural activities, and had no limitations regarding other physical functions, environmental restrictions and range of motion. (R. 732-33.)  Dr. John's assessment is reviewed with the medical evidence above.

As noted above, the record contains a consultative examination report from Sue Labar Yohey, M.Ed., dated March 9, 2012, to whom Plaintiff was referred for psychological evaluation. (R. 742-51.) Dr. Yohey completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (R. 750-51.)  She specifically concluded that Plaintiff's ability to understand, remember and carry out instructions was slightly to moderately affected by his impairment. (R. 750.)  His ability to respond appropriately to supervisors, co-workers, and work pressures in a work setting was similarly affected. (*Id.*)

In the March 29, 2012, Disability Determination Explanation Plaintiff was found not to be disabled based on non-severe disorders of the male genital organs and affective disorders. (R. 163-170.)  Dr. John's opinion was found to overestimate the physical limitations/restrictions in lifting, carrying and sitting in that the limitations were not supported by clinical examination and other medical evidence. (R. 169.)  Further, the Explanation states that the opinion relies heavily on the subjective report of symptoms and limitations provided by Plaintiff--it is an

15

overestimate of the severity of Plaintiff's restrictions/limitations and "based only on a snapshot of [his] functioning." (R. 170.)  Dr. Yohey's opinion was given great weight in that the findings concerning Plaintiff's abilities in the areas of making occupational adjustments, making performance adjustments, making personal and social adjustments and other work related activities were fairly consistent with the other evidence in the file. (R. 169.)

2. **Function Reports and ALJ Hearing Testimony**

In the "Function Report - Adult" Plaintiff stated that his illnesses, injuries, or conditions limit his ability to work based on concentration, standing and sitting for long periods, and bad groin pain. (R. 259.)  He reported that he has had the pain for about eight years but it has gotten worse, it spreads from his groin to his back, the pain is worse at certain times of the day and is constant but inconsistent. (R. 267.)  He also reports that he has pressure in his head as well as the groin pain. (*Id.*)

At the outset of the ALJ hearing, Plaintiff's attorney acknowledged Plaintiff's mental health issues but stated that his groin pain was a more serious problem. (R. 101-02.)  Plaintiff testified that he stopped working because he was worried that his concentration and focus were bad, sitting all the time was bothering his groin area, and he couldn't deal with it and was afraid he would do something wrong while he was driving. (R. 103.)

16

He stated that medication takes the edge off the pain but it's "uncontrollable." (R. 104.) He estimated that the medication, Gabapentin, takes the pain from ten down to seven or eight on a scale of one to ten, and down to a two or three if he lies down. (R. 116.) Plaintiff reported that lying down was the best position for him regarding the groin pain and it bothers him to sit in the same spot for a long time. (R. 109.) Plaintiff also stated that he was planning in the near future to go for another opinion about what could be done to address his groin problem. (R. 118.)

## 3.   **ALJ Decision**

By decision of October 22, 2012, ALJ Torres determined that Plaintiff was not disabled as defined in the Social Security Act. (R. 27.) She made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.   The claimant has not engaged in substantial gainful activity since November 26, 2011, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.   The claimant has the following severe impairments: varicose veins, obesity, hypertension, pancreatitis, obstructive sleep apnea, depressive disorder and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one

17

of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant must never climb ladders, ropes or scaffolds, He must avoid concentrated prolonged exposure to loud noises, vibrations, fumes, odors, dusts, gases, poor ventilation and hazards such as heights and moving machinery.  The claimant could understand, remember and carry out simple instructions in an environment free of fast-paced production requirements involving only simple work related decisions with few work place changes.  The claimant could occasionally interact with supervisors, co-workers and the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 18, 1972 and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P,

18

Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act from November 26, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 82-90.)

Because Plaintiff's alleged errors relate to his testicular/groin pain, we focus on this aspect of the ALJ decision. The ALJ found that Plaintiff's medically determinable impairments could be expected to cause his alleged symptoms but his "statements regarding the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 86.) The ALJ noted that the groin pain was controlled with Gabapentin (R. 87 (citing Exhibits 20F, 22F, 23F and 24F)) and that "the records confirm pain or discomfort related to veins in the scrotum but the findings support an ability to perform sedentary work" (R. 88). The ALJ states that her "finding is consistent with the objective medical evidence including diagnostic testing and measurable findings on clinical examinations [as well as his] activity level as indicated by his stated ability to cook, clean, vacuum, shop and perform personal care activities." (*Id.*)

19

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); see *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e).  The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. 89-90.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a

21

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.

1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See, e.g., Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."").  "However,

even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See, e.g., Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

### A. *General Considerations*

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These

24

proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence.  *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

## B.   *Plaintiff's Alleged Errors*

As set out above, Plaintiff argues that the decision of the Social Security Administration is error because the ALJ did not give appropriate weight to Plaintiff's subjective complaints of testicular pain related to varicoceles and the ALJ's RFC and step five determination were flawed in that they did not take the testicular pain into account.  (Doc. 18 at 2-15.)

## 1.   Plaintiff's Credibility

Plaintiff first asserts that the ALJ erred in her evaluation of his testicular pain from varicoceles because she did not properly weigh his subjective complaints of pain.  (Doc. 18 at 2-13.)  We disagree.

25

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)). "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "One strong indication of the credibility of an individual's statements is their consistency, both internally and

26

with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529.  First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  *Id.*  In so doing, the medical evidence of record is considered along with the claimant's statements.  *Id.*

The regulations provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii), 416.929(c)(3)(i-

27

vii).

The Third Circuit has explained:

> An ALJ must give serious consideration
> to a claimant's subjective complaints of
> pain, even where those complaints are not
> supported by objective evidence. *Ferguson v.
> Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).
> "While there must be objective evidence of
> some condition that could reasonably produce
> pain, there need not be objective evidence of
> the pain itself." *Green* [*v. Schweiker*, 749
> F.2d 1066, 1071 (3d Cir. 1984)]. Where
> medical evidence does support a claimant's
> complaints of pain, the complaints should
> then be given "great weight" and may not be
> disregarded unless there exists contradictory
> medical evidence. *Carter* [*v. Railroad
> Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.
> 1987)]; *Ferguson*, 765 F.2d at 37.

*Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

Here there is objective evidence of a condition that could
reasonably produce Plaintiff's testicular pain--the varicoceles
have been diagnosed based on objective testing and Plaintiff has
treated regularly for the condition. Thus, this is a case where
Plaintiff's complaints of pain should have been given great weight
and could only be disregarded if there was contradictory medical
evidence. *Id.*

Plaintiff asserts that the only evidence in this category is a
notation that Plaintiff experienced a 70% improvement in his
testicular pain with medication, adding that "a single note that
someone has improved 70% does not mean that their pain is fully
controlled but, rather, just the opposite." (Doc. 18 at 8.) This

28

notation was made when Plaintiff saw Dr. Simmons on November 26, 2012.  (R. 905.)

Defendant points to this evidence as well as the following: 1) activities of daily living recorded in the consultative examination of Sue Labar Yohey, M.Ed., dated March 9, 2012, to whom Plaintiff was referred for psychological evaluation (R. 742-51); 2) a February 24, 2012, report from consultative examiner Maliyakkal John, M.D. (R. 732); and 3) March 2013 treatment notes indicating Plaintiff's gait was steady and he was able to move all of his extremities without difficulty (R. 925). (Doc. 19 at 15-16.)

Dr. Yohey's findings regarding activities of daily living would not be considered medical evidence contradicting Plaintiff's complaints of pain.  However, Dr. Simmons November 26, 2012, treatment notes, portions of Dr. John's assessment, and March 6, 2013, notes from the physical examination conducted by CRNP Thea Niedzwiedz in Geisinger's Sleep Medicine department potentially fall into the category of contradictory medical evidence.  The problem is that the only medical evidence referenced by the ALJ in direct correlation to Plaintiff's groin pain is that it was controlled by the use of Gabapentin.  (R. 87.)  While it may be that evidence arguably contradicting Plaintiff's allegations of constant severe pain (see R. 112) may be found in physical examination notes and Plaintiff's reporting at office visits, neither Defendant nor the Court can do what the ALJ should have

done.  It is the ALJ's responsibility to explicitly provide reasons for her decision and the analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision. *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07.

The question then is whether the ALJ's Gabapentin reference is sufficient to undermine the weight which would otherwise be attributed to Plaintiff's complaints of pain.[2]  *See Mason*, 994 F.2d at 1067-68.  We find the ALJ's review of the record problematic in that general citation to multiple page exhibits does not facilitate a review of the ALJ's claimed support for the conclusion that Plaintiff's pain is controlled by Gabapentin.  (*See* R. 87 (citing Exhibits 20F, 22F, 23F and 24F).)  Of further concern is that review of the one hundred sixty-seven pages contained in the four cited exhibits confirms Plaintiff's contention that the only direct support for the ALJ's conclusion is found in Dr. Simmons' office visit notes of November 26, 2012.  (Doc. 18 at 8 (citing R. 905).)  Despite these concerns, we conclude Dr. Simmons' notation is

---

[2]  We agree with Plaintiff that Dr. Simmons notation that Plaintiff's pain was 70% controlled does not mean the pain was fully controlled.  (Doc. 18 at 8.)  However, the ALJ never found that Plaintiff's pain was *fully* controlled, i.e., alleviated, with the use of Gabapentin.  (R. 87.)  We reject Plaintiff's assertion that "[t]he conclusion that a reader should draw, from a the [sic] ALJ's statement that the plaintiff's testicular pain was 'controlled' by Gabapentin, is that it was fully controlled, as the ALJ did not modify that finding in any way."  (Doc. 22 at 5.)  As discussed in the text, the ALJ acknowledged Plaintiff's allegations of pain in her analysis.

significant and sufficiently direct to be considered evidence
contradictory to Plaintiff's subjective reporting of the extent and
effects of his pain. *Mason*, 994 F.2d at 1067-68. Furthermore,
other indirect evidence within the exhibits cited by the ALJ
supports the ALJ's Gabapentin assertion. Specifically, notes from
Plaintiff's January 10, 2013, office visit to Dr. Hottenstein
support the inference that Plaintiff's testicular pain was
controlled by Gabapentin: Plaintiff was taking Gabapentin at the
time (R. 914); he reported that he was "feeling ok overall" (R.
913); physical examination showed that generally Plaintiff was
alert and in no distress (R. 915); and other than being listed in
the Active Problem List, no other reference was made to Plaintiff's
bilateral varicoceles at this visit--the Assessment/Plan addressed
Plaintiff's diabetes, eczema, dyslipidemia, and the need for
pneumonia and flu vaccines and Plaintiff was directed to return in
three months (R. 915). (*Id.*) With this evidence countering
Plaintiff's assertions of constant pain and consistent severity, we
conclude ALJ Torres' credibility determination is due the deference
ordinarily assigned. *See Coleman*, 440 F. App'x at 253.

We are not persuaded otherwise by Plaintiff's arguments that
the ALJ failed to discuss February 19, 2013, notes from a
psychiatric medication check where the Axis III diagnosis is
"chronic pain issues" and the Plan includes increasing Plaintiff's
Gabapentin dosage, and the ALJ also failed to discuss Plaintiff's

31

testimony about a dosage increase.  (Doc. 18 at 11 (citing R. 120, 775).)  Importantly, the ALJ acknowledges that "the records do confirm pain or discomfort related to veins in the scrotum."  (R. 88.)  Thus, her failure to discuss specific evidence--evidence which does not provide specific medical support of debilitating pain--is not error.

In further support of the ALJ's alleged credibility error, Plaintiff points to the fact that the ALJ gave little weight to Dr. John's consultative examination report.  (Doc. 18 at 12.)  The ALJ reviewed Dr. John's report as follows:

> Dr. John completed a medical source statement in which he opined that the claimant could lift and carry 25 pounds frequently, 50 pounds occasionally.  He could stand/walk for 1 to 2 hours in an 8-hour day and sit for less than 6 hours in an 8-hour day.  No limitations were noted on pushing/pulling and the claimant could occasionally perform postural maneuvers such as balancing, stooping, crouching and crawling (Exhibit 14F).
>
> As for the opinion evidence, limited weight is given to [sic] opinion of Dr. John in Exhibit 14F that the claimant could not work for 8 hours, as this is not supported by the examination which revealed normal motor and sensory examination as well as no decreased range of motion.  Additionally, Dr. John is not a treating physician of the claimant and was relying solely and exclusively on one observation made on the day of the consultative examination and not upon objective long-term observations and experiences with the claimant.

(R. 87-88.)

32

Plaintiff acknowledges that Dr. John did not fully articulate the reasons for his conclusions regarding sitting and standing, but he maintains that range of motion was not the issue. (Doc. 18 at 12.) Plaintiff further avers, that "[e]ven if the ALJ could discount the consultative examination report of Dr. John, she certainly could not claim that it was evidence that would negate the subjective complaints of pain." (Doc. 18 at 13.)

Even if we were to agree with Plaintiff's assertion that range of motion was not the issue (Doc. 18 at 12), this was not the only basis on which the ALJ gave little weight to Dr. John's opinion--the ALJ noted that Dr. John was not a treating physician and relied solely on one observation made on the day of the evaluation. (R. 88.) The ALJ's weighing of the relationship between Plaintiff and Dr. John is appropriate pursuant to 20 C.F.R. § 404.1527(c). Furthermore, Dr. John's evaluation was primarily a form report and the Third Circuit Court has characterized a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best,'" *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). Our Circuit Court of Appeals has also made it clear that an ALJ is free to accept some medical evidence and reject other evidence, "provided that [s]he provides a reason for discrediting the rejected evidence." *Zirnsak v. Colvin*, 777 F.3d

607, 614 (3d Cir. 2014) (citations omitted).

Regarding Plaintiff's assertion that the ALJ could not claim that Dr. John's report was evidence that would negate the subjective complaints of pain (Doc. 18 at 13), the ALJ does not make any such claim. However, this is a conclusion without consequence because, as discussed above, we have found that the ALJ identified other evidence which negates Plaintiff's subjective complaints of pain. We further note that although Dr. John's recording that Plaintiff had diffuse tenderness of his testicles on examination does not *negate* Plaintiff's subjective complaints of pain, the statement does not *support* Plaintiff's subjective complaints--"diffuse" goes to the area affected by the pain and "tenderness" is not synonymous with severe pain.

Because Plaintiff has not shown that the ALJ erred in her credibility determination, this claimed error is not cause for remand.

## 2.   **RFC and Step Five Determination**

Plaintiff's second claimed error is that the ALJ's RFC and step five determination did not take Plaintiff's testicular pain into account. (Doc. 18 at 13.) We disagree.

Specifically, Plaintiff asserts that "[t]he ALJ states that she has determined that the plaintiff can perform less than a full range of sedentary work but there is no indication that she has taken into account the constant testicular pain that the

34

plaintiff's medical records show exists." (Doc. 18 at 14.)
The first problem with this assertion is that the medical records
do not show that Plaintiff suffered from constant testicular pain.
The medical records show that very often Plaintiff complained of
constant testicular pain. This was subjective reporting--Plaintiff
points to no medical records which objectively observe/assess him
to be in great pain. As noted in the previous section of this
Memorandum, at some medical visits, the bilateral varicoceles was
not discussed or noted beyond being identified in Plaintiff's
problem list. Furthermore, Plaintiff's self-reporting on occasion
can be construed to undermine his allegations of constant severe
pain: at his June 21, 2012, visit to Dr. Hottenstein, the doctor
noted that Plaintiff had been going to the free clinic and was
"seeking permanent disability due to *anxiety/depression*" and
Plaintiff reported he had "recurrent scrotal varices, *painful after
standing*," (R. 810 (emphasis added)); Plaintiff's statement to Dr.
John on February 12, 2012, that he gets excruciating pain *a few
times a day* (R. 736); and Plaintiff's report to Dr. Hottenstein on
January 10, 2013, that he was "feeling ok overall" (R. 913).

The second problem with Plaintiff's assertion is that the ALJ
determined Plaintiff to be less than fully credible regarding his
complaints of testicular pain. As set out above, we found that the
determination was appropriate. In the section of the ALJ Decision
explaining the basis for the RFC, the summary states that "[t]he

35

records do confirm pain or discomfort related to veins in the scrotum but the findings support an ability to perform sedentary work." (R. 88.) This statement and the preceding discussion show that the ALJ did not fail to take Plaintiff's testicular pain into account but rather took it into account and concluded Plaintiff was capable of performing sedentary work as described. Contrary to Plaintiff's assertion that the ALJ's RFC determination had to be based on the conclusion that Plaintiff had no pain (Doc. 18 at 14-15; Doc. 22 at 9-10), there is no innate contradiction between a finding that an individual is capable of doing sedentary work while suffering with some pain.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied. An appropriate Order is filed simultaneously with this Memorandum.

RICHARD P. CONABOY
United States District Judge

DATED: _6-5-15_

36